# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BUC-EE'S LTD.,<br><br>        Plaintiff,<br><br>v.<br><br>VISA, INTERNATIONAL SERVICE ASSOCIATION, VISA U.S.A., VISA, INC., MASTERCARD INCORPORATED, MASTERCARD INTERNATIONAL INCORPORATED, JP MORGAN CHASE & CO., CHASE BANK USA, N.A., JP MORGAN CHASE BANK, N.A., AND PAYMENTECH, LLC,<br><br>        Defendants. | **13 CV 3589**<br><br>Civil Action No.: _____<br><br>RECEIVED<br>MAY 28 2013<br>U.S.D.C. S.D. N.Y.<br>CASHIERS<br><br>ECF Case<br><br>JURY TRIAL DEMANDED |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Buc-ee's, Ltd. ("Buc-ee's") for its Complaint against Defendants Visa, Inc., Visa U.S.A., Inc., Visa International Service Association, MasterCard Incorporated, and MasterCard International Incorporated and the Chase Defendants, defined below, aver and allege as follows:

## INTRODUCTION

1.      This action is brought against Visa, Inc., Visa U.S.A., Inc., and Visa International Service Association (collectively "Visa"), MasterCard Incorporated and MasterCard International Incorporated (collectively "MasterCard") and the following bank defendants: JP Morgan Chase Bank, N.A., Chase Bank USA, N.A., JP Morgan Chase & Co. and Paymentech, LLC ("Chase Defendants"). Visa and MasterCard each has in the past and continues to manage, coordinate, and govern a combination in restraint of trade within the meaning of the Sherman Antitrust Act, 15 U .S.C. § 1. Each combination has as its members the overwhelming majority of banks or financial institutions that issue credit and debit cards in the United States, including

the Chase Defendants. The vast majority of the banks and financial institutions that are members of Visa are also members of MasterCard, and issue both Visa-branded and MasterCard-branded credit and debit cards. These issuing banks are independently owned and managed banks and financial institutions that compete to issue credit and debit cards to consumers. However, through their membership and agreement to abide by the rules of Visa and MasterCard, each issuing bank has agreed not to compete for merchant acceptance of the credit and debit cards that it issues.

2.      There are two main categories of payment cards: credit (including charge) cards and debit cards. Credit cards are payment cards that allow consumers to make purchases on credit. Charge cards are similar to credit cards, but require that the full balance be paid upon receipt of the billing statement. Debit cards are linked to a consumer's demand account or are prepaid.

3.      Banks earn income on credit (and charge) cards through fees and charges to the cardholder, including interest on the account balance, and from the fees and penalties that come with late payment on card balances. Banks earn income on debit cards through the opportunity to use the funds a consumer maintains in his or her account and on various fees associated with those accounts. Banks also earn income on credit and debit cards through the interchange fees paid by merchants. Interchange fees are imposed on merchants by Visa and MasterCard for the privilege of accepting the issuing bank's card from a consumer as a means of payment, and are collected from the merchant and paid to the issuer of the card. The profitability to issuing banks of credit and debit cards directly increases with the size and frequency of transactions in which the cards are used.

2730457v1/101971

4.      Banks issuing credit and debit cards compete with one another to issue cards to consumers (sometimes referred to hereafter as "cardholders") who use those cards to purchase goods and services from merchants. Issuing banks that are members of Visa and MasterCard compete with each other in the issuance of credit and debit cards to consumers. For example, issuing banks offer cards with various combinations of interest rates, annual fees, cash back rewards, points, and other features to compete for cardholders and to induce cardholders to use their cards.

5.      Visa and MasterCard have adopted nearly identical rules, which are agreed to by their member banks and imposed on merchants that accept cards issued by those banks. These rules, or Competitive Restraints, eliminate competition among their member issuing banks for merchant acceptance of credit cards and merchant acceptance of debit cards. As a consequence of having as members nearly all card issuers in the United States, and as a consequence of those card issuers having agreed to rules that preclude them from independently competing for merchant acceptance, Visa and MasterCard and their members have obtained and maintained market power in the market for merchant acceptance of credit cards and the market for merchant acceptance of debit cards in the United States. The exercise of this market power has led merchants to pay excessive interchange fees. In this manner, Visa and MasterCard have unlawfully restrained and continue to unlawfully restrain competition in these markets.

6.      The principal rules that constitute the Competitive Restraints are the setting of "default" interchange fees, the Honor All Cards Rules, the All Outlets Rules, the No Discount Rules, and the No Surcharge Rules. These rules, individually and in combination, preclude merchants from gaining the benefits of competition as to the terms, including a fee (if any), for the acceptance of cards of particular issuing banks and preclude card issuers from competing for

merchant acceptance of their cards. As a consequence, the setting of "default" interchange fees effectively fixes the price of acceptance at a supracompetitive level. Plaintiff has paid and continues to pay significantly higher costs to accept Visa-branded and MasterCard-branded credit and debit cards than it would if the banks issuing such cards competed for merchant acceptance.

7.      Because of their participation in the Competitive Restraints through their membership in Visa and MasterCard, issuing banks do not compete for transaction volume by independently competing for merchant acceptance.

8.      Visa and MasterCard, on behalf of their member issuing banks, including the Chase Defendants, have exploited their market power in the market for merchant acceptance of credit cards and the market for merchant acceptance of debit cards by creating interchange fee schedules designed to increase the amount of interchange fees issuing banks are able to obtain from merchants. While Visa and MasterCard nominally refer to these schedules as "default" interchange fee schedules, suggesting it is possible for issuing banks and merchants to gain different interchange rates by entering acceptance agreements between themselves, the Competitive Restraints prevent such agreements. By setting and enforcing supracompetitive interchange fees applicable to all merchants that accept cards issued by their members, Visa and MasterCard act as agents of their members for the purposes of exercising the market power gained by their combinations.

9.      Over the past decade, judicial efforts to curb the exercise of market power by the Visa and MasterCard combinations have been ineffective. In 2003, the exclusivity rules of both combinations, which prohibited member banks from issuing cards competing on American Express or Discover networks, were declared unlawful. In that same year, in a class action

4

settlement, Visa and MasterCard agreed to cease using the Honor All Cards Rules to tie credit card acceptance and debit card acceptance. Those actions did not diminish Visa's and MasterCard's power to dictate price and prevent competition. Immediately after those actions, both combinations increased the credit card interchange fees extracted from merchants. And the debit card interchange fees they were imposing after these judicial actions were subsequently found by the Federal Reserve Board to be significantly above cost.

10.    In 2008, in response to a U.S. Department of Justice investigation, Visa withdrew its rule limiting merchants' ability to accept PIN debit cards. Two years later, in a settlement with the Department of Justice, the Visa and MasterCard combinations both amended their rules to allow merchants to offer discounts to consumers in broader circumstances than previously allowed. These changes did not, however, diminish the combinations' market power or lead to a reduction in interchange fees paid by merchants. Instead, interchange fees continue to increase.

11.    In 2011, as mandated by the Durbin Amendment to the Dodd-Frank Wall Street Reform and Consumer Protection Act, 15 U.S.C. 16930-2, the Federal Reserve Board set a maximum level of interchange fees that large banks could levy on debit card transactions and eliminated any distinction between signature debit (which carried interchange rates comparable to credit interchange rates) and PIN debit interchange. This maximum fee was set significantly below the then-existing interchange fee levels set by Visa and MasterCard for debit card transactions. The Federal Reserve Board action did not apply to the approximately one-third of debit cards issued by smaller, non-regulated banks, nor did it apply to credit cards. The Federal Reserve Board did not prohibit debit or credit interchange fees from being set below this maximum level.

2730457v1/101971

12.     If freed of the imposition of "default" interchange fees and the Competitive Restraints, issuing banks and merchants would operate in competitive markets for merchant acceptance of credit cards and merchant acceptance of debit cards and benefit from competition among issuing banks as to interchange fees. Collectively set interchange fees do not protect merchants such as Plaintiff, but rather allow issuing banks to charge interchange fees far in excess of the issuing banks' costs. In competitive markets, interchange fees would move to competitive levels, and the interchange fees paid by Plaintiff would be substantially below the amounts they have paid since January 1, 2004. If merchants had the ability to use competitive strategies with respect to their acceptance of the cards of individual issuers, they would induce competition among issuing banks that would lead to lower interchange fees.

13.     Plaintiff paid more than $12 million in credit and debit interchange fees to issuing banks that are members of Visa and MasterCard and expect to pay more than $3 million per year going forward. Interchange fees are generally one of a merchant's largest operating expense items. Elimination of the Competitive Restraints and restoration of competitive markets for merchant acceptance would substantially reduce interchange fees, allowing Plaintiff to operate more efficiently and at lower costs, to the benefit of consumers. Plaintiff operates in intensely competitive markets and would use the savings from a reduction in its interchange costs to increase their competitiveness by enhancing the value their customers receive.

## JURISDICTION AND VENUE

14.     The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1337 (commerce and antitrust regulation), because this action arises under Sections 1 and 2 of the Sherman Act (15 U.S.C. § 1) and Sections 4 and 16 of the Clayton Act (15 U.S.C. § 26).

6

2730457v1/101971

15.     This Court has jurisdiction over Plaintiff's state-law claims under 28 U.S.C. §§ 1332 and 1367.

16.     Venue is proper in the United States District Court for the Southern District of New York because Defendants reside in, are found in, have agents in, and transact business in this District as provided in 28 U.S.C. §§ 1391, 1407 and 15 U.S.C. §§ 15, 22, and 26.

17.     This Court has personal jurisdiction over Defendants because, inter alia, they: (a) transacted business throughout the United States, including in this District; (b) had substantial contacts with the United States, including in this District; and/or (c) were engaged in an illegal anticompetitive scheme that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District. A substantial part of the interstate trade and commerce involved and affected by the alleged violations of the antitrust laws was and is carried on in part within this District.  The acts complained of have had, and will have, substantial anticompetitive effects in this District.

## DEFINITIONS

18.     For purposes of this Complaint, the following definitions apply.

19.     "Access Device" means any device, including but not limited to Payment Card or microchip, that may be used by a consumer to initiate a General Purpose Card or Debit Card Transaction.

20.     "Charge Card" or "Travel & Entertainment Card" (T&E) is an access device, usually a Payment Card, enabling the holder to purchase goods and services on credit to be paid on behalf of the holder by the issuer of such device. Typically, the contractual terms of such cards require that payment from the holder to the issuer be made in full each month, for all payments made on behalf of the cardholder by the issuer during the preceding month. The issuer

2730457v1/101971

does not extend credit to the holder beyond the date of the monthly statement, nor does it impose interest charges on the balance due except as a penalty for late payment. Examples of Charge Cards are the American Express Green, Gold, Platinum, and Centurion cards as well as the Diners Club and Carte Blanche cards issued by Citibank.

21.     "Credit card" is an access device, usually a Payment Card, enabling the cardholder to purchase goods or services from any merchant that has an agreement to accept such cards. The credit cards at issue here are general purpose payment cards, as distinguished from private label cards, which can only be used at a single merchant. Payment to a merchant for the goods or services purchased using a credit card is made by the issuing bank of the card on behalf of the cardholder, with repayment by the cardholder subject to an agreement between the issuing bank and the cardholder. Credit cards enable a cardholder to obtain goods or services from a merchant on credit provided by the card issuer. Credit card issuers compete for consumers by offering a variety of terms and types of cards, which vary by level of rewards that are intended to induce consumers to use their cards. Cards with a higher level of rewards are often referred to as "premium" cards and carry higher interchange fees, though they afford no additional benefits to merchants. Credit cards include charge cards, which allow the cardholder to obtain goods or services with a grace period before the cardholder is required to pay his or her full balance.

22.     "Debit card" is an access device, usually a Payment Card, that allows holders of accounts at a bank to pay for goods or services or to obtain cash by directly accessing their accounts. They also include pre-paid cards, which require a prepayment of the amount that can be drawn by the user of the card. There are two methods of authenticating debit cards. PIN debit cards require the cardholder to enter a four-digit personal identification number (PIN) to

8

authenticate the cardholder. Signature debit cards usually require the cardholder's signature at the time of the transaction. In the past, some PIN debit cards did not carry interchange fees or were subject to reverse interchange - where the merchant received a fee for card acceptance. Signature debit cards generally carried higher interchange fees, some of which equaled the interchange fees charged for credit card transactions. In 2011, pursuant to the Durbin Amendment, Federal Reserve Board regulations set the maximum interchange fee for regulated issuers at $.21 plus 0.05% (plus an additional $.01 for fraud prevention for eligible issuers), or an average of $.23-.24 per debit transaction. In contrast, the signature debit interchange fees previously set by Visa and MasterCard average $.58 and $.59, respectively, for the same issuers.

23.     An "issuing bank" is a member of Visa or MasterCard that issues general purpose credit or debit cards to cardholders. The majority of issuing banks are members of both Visa and MasterCard and compete with one another to issue cards to potential cardholders and to encourage the use of their cards by cardholders.

24.     An "acquiring bank" is a member of Visa or MasterCard that acquires purchase transactions from merchants. All acquiring banks are members of Visa and MasterCard. As member banks, acquiring banks act as gatekeepers, ensuring that card transactions are routed over the Visa or MasterCard networks, that interchange fees set by Visa and MasterCard are paid on all transactions, and that merchants abide by the rules imposed by Visa and MasterCard. Acquiring banks compete with one another for the acquisition business of merchants.

25.     "All-Outlets Rule" is a rule of the Visa and MasterCard Networks that requires a Merchant with multiple outlets to accept Visa or MasterCard, respectively, in all of its outlets, even if those outlets are owned by a separate corporate entity, operated under a different brand

name, or employ a different business model in order for the Merchant to receive the interchange rates for which the Merchant would ordinarily qualify.

26.    "Assessment" refers to an amount computed and charged by the Visa and MasterCard Networks on each transaction amount to the Acquiring and Issuing Banks.

27.    "Authorization" is the process by which a Merchant determines whether a cardholder is authorized by his or her Issuing Bank to make a particular transaction. The Merchant sends the cardholder's information to its Acquiring Bank or a Third-Party Processor, which sends it to Visa or MasterCard, which then sends it to the issuer or the issuer's processor, to obtain authorization. If authorization is given, the process is repeated in reverse.

28.    "Float" refers to the expense the Issuing Bank incurs by extending interest-free credit to the consumer for the Grace Period between the date of purchase and the date of payment.

29.    "General Purpose Cards" collectively refers to general purpose Credit Cards and Charge Cards, as distinguished from cards that can be used only at a single merchant.

30.    "Network services" include, among other things, the services of authorization, clearance, and settlement of payment card transactions that the members of Visa and MasterCard have delegated to the networks to provide on the members' behalf. Authorization, clearance, and settlement refers to the process by which payment card transactions are completed.

31.    "Interchange fee" is the fee that issuing banks receive and merchants pay when they accept a credit card or debit card issued by a member of the Visa or MasterCard combinations. Under the agreements by and among Visa and its member banks and MasterCard and its member banks, the so-called "default" interchange fees are set by Visa and MasterCard,

respectively, and the payment on interchange and other rules are enforced through the acquiring banks.

32.    "Merchant discount" is the term used to describe the total amount of fees and other costs deducted from the original transaction amount, reflecting a merchant's incremental cost of acceptance. The merchant discount includes the interchange fee.

## THE PARTIES

## PLAINTIFF

33.    Plaintiff Buc-ee's, Ltd.is a Texas limited Partnership with its principal place of business in Lake Jackson, Texas.  Buc-ee's operates 27 retail stores in Texas. Buc-ee's accepts both Visa and MasterCard debit and credit cards for payment in its stores. Accordingly, Buc-ee's has been forced to pay Defendants' supracompetitive interchange fees and to abide by Defendants' Competitive Restraints. Buc-ee's, therefore, has been injured in its business or property as a result of the unlawful conduct alleged herein.

34.    The Plaintiff has timely opted out of the Rule 23(b)(3) settlement class preliminarily approved by the court on November 28, 2012 in the case captioned: *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation,* Case No. 1 :05-md-01720-JGJO, United States District Court for the Eastern District of New York. Plaintiff has also filed an objection to the Rule 23(b)(2) settlement class in that litigation and, if allowed, would also opt out of the Rule 23(b)(2) settlement class.

## DEFENDANTS

35.    Until the corporate restructuring and initial public offering described below, Defendant Visa International Service Association was a non-stock Delaware corporation with its principal place of business in Foster City, California. Defendant Visa U.S.A., Inc. was a group

2730457v1/101971

member of Visa International Service Association and was also a non-stock Delaware corporation. Visa U.S.A., Inc. had its principal place of business in San Francisco, California. Visa U.S.A., Inc.'s members were the financial institutions acting as issuing banks and acquiring banks in the Visa system.

36.     Defendant Visa Inc. is a Delaware corporation with its principal place of business in San Francisco, California. Defendant Visa Inc. was created through a corporate reorganization in or around October 2007. Visa U.S.A. Inc.'s member banks were the initial shareholders of Visa, Inc.

37.     Defendants Visa Inc., Visa U.S.A., Inc., and Visa International Service Association are referred to collectively as "Visa" in this Complaint.

38.     Defendant MasterCard Incorporated was incorporated as a Delaware stock corporation in May 2001. Its principal place of business is in Purchase, New York.

39.     Defendant MasterCard International Incorporated was formed in November 1966 as a Delaware membership corporation whose principal or affiliate members were its financial institution issuing banks and acquiring banks. Prior to the initial public offering described below, MasterCard International Incorporated was the principal operating subsidiary of MasterCard Incorporated.

40.     Defendants MasterCard International Incorporated and MasterCard Incorporated are referred to collectively as "MasterCard" in this Complaint.

41.     Defendant JPMorgan Chase & Co. is a Delaware Corporation and has its principal place of business in New York, New York.

42.     Defendant Chase Bank USA, N.A., is a New York bank with its principal place of business in New York, New York.  It is the successor to Chase Manhattan Bank USA, N.A., and a wholly owned subsidiary of Defendant JP Morgan Chase & Co.

43.     Defendant JP Morgan Chase Bank, N.A., is a nationally chartered bank operating under the laws of Ohio with its primary place of business in Columbus, Ohio.

44.     Defendant Paymentech, LLC ("Chase Paymentech") is a limited liability company organized under the laws of Delaware, with its principal place of business in Dallas, Texas.  Chase Paymentech is a subsidiary of Defendant JP Morgan Chase Bank, N.A.

45.     Defendants Chase Paymentech, JP Morgan Chase Bank, N.A., Chase Bank USA, N.A., and JP Morgan Chase & Co. are collectively referred to herein as "Chase" or the "Chase Defendants."   Chase is a member of both Visa and MasterCard. It engages in interstate commerce.   It is an issuing bank that issues Payment Cards to individuals and business throughout this judicial district.  Between 2000 and 2003, Chase was represented on the Visa U.S.A. Board of Directors.   Chase is currently represented on the Board of Directors of Defendant Visa, Inc.  Through Defendant Chase Paymentech, it is also an Acquiring Bank that provides card-acceptance services to its customers, including Plaintiff.

46.     The Chase Defendants, along with other member banks, are therefore directly responsible for fixing Interchange fees within each network and between the networks. The Chase Defendants and other banks, acting by and through the Boards of Directors of Visa and MasterCard, are also directly responsible for the imposition of the Competitive Restraints. Collectively, the member banks, including Chase, through their operation of Visa and MasterCard, adopted and approved the above-mentioned policies and have significantly profited from those policies.

13

## THE PAYMENT CARD INDUSTRY IN GENERAL

47.     The payment card industry involves two categories of general purpose payment cards: (1) credit (including charge) cards and (2) debit cards. As explained more fully below, credit cards constitute a separate product market from debit cards.

48.     Card issuers earn income when card users select and use their cards and when merchants accept their cards. Issuing banks compete to have cardholders carry and use payment cards that they issue. By agreeing to the Competitive Restraints, issuing banks have agreed to limit competition among themselves for merchant acceptance of payment cards.

49.     Credit cards (other than charge cards) permit consumers to borrow the money for a purchase from the card issuer and to repay that debt over time, according to the provisions of a revolving-credit agreement between the cardholder and the issuing bank. Charge cards provide an interest-free loan during a grace period.

50.     Issuing banks compete for cardholders and card usage by offering numerous credit card products, some of which offer features such as cash back rebates, low interest rates, low or no annual fees, and rewards programs tied to usage. Cards that offer cash-back, airline miles or other usage benefits are often referred to as "rewards cards." Those rewards cards that offer the highest levels of rewards are referred to as "premium cards" and include cards such as Visa Signature Preferred and MasterCard World Elite. Standard or ''traditional'' credit cards, which do not offer the same array of features to cardholders, include products such as Visa Traditional and the MasterCard Core Value card. Interchange fees for premium credit cards are higher than the interchange fees merchants are charged on other rewards cards, which in turn are higher than those charged on standard credit card transactions. Merchants such as Plaintiff receive no additional benefits from the higher interchange fees they must pay on transactions in

14

which those cards are used. Nevertheless, merchants do not have the ability to refuse to accept rewards cards.

51.     Debit cards are one means for demand deposit account holders to access the money in their accounts. Pre-paid debit cards allow cardholders to access the funds deposited on the card when it was purchased. There are two primary forms of authentication in use for debit cards in the United States. One is signature-based, in which the cardholder's signature is usually (but not always) obtained at the time of the transaction. The other is PIN-based, in which the cardholder enters a four-digit PIN to authenticate the cardholder.

52.     Because debit card transactions promptly withdraw funds from the cardholder's account or from the card balance, rather than allowing a grace period before billing and payment, they differ from credit card transactions in their utility to consumers. These differences underlay the court's determination in *United States v. Visa U.S.A., Inc.,* 163 F. Supp. 2d 322 (S.D.N.Y. *2001), affd,* 344 F.3d 229 (2d. Cir. 2003), that credit card transactions comprised a separate market from the market for debit card transactions.

## THE COMBINATIONS

53.     Visa and MasterCard until recently were organized as joint ventures of their member issuing banks and acquiring banks. As members of the joint ventures, the member banks agreed to a collection of restrictive rules, referred to herein as the Competitive Restraints, and to impose those Competitive Restraints on merchants that accept Visa-branded and MasterCard-branded cards. Among the Competitive Restraints are "default" interchange fees that merchants are required to pay for the privilege of accepting Visa-branded and MasterCard-branded cards. "Default" interchange fee rates are set by Visa and MasterCard for the benefit of their member

2730457v1/101971

issuing banks. As a result of the Competitive Restraints, the "default" interchange fees are made binding.

54.     Through these joint ventures, Visa, MasterCard, and their respective issuing banks collectively have gained market power in the payment card market. The Competitive Restraints have eliminated competition among issuing banks for merchant acceptance and eliminated any possibility that competition between the issuing banks could enable separate terms of acceptance for the cards of each issuing bank. These Competitive Restraints have eliminated the development of competitive markets for merchant acceptance.

55.     The Competitive Restraints enforced by Visa and MasterCard, and the actions taken in furtherance of these restraints, constituted and continue to constitute combinations in restraint of trade in violation of Section I of the Sherman Act, 15 U .S.C. § 1.

56.     In 2006 and 2008, respectively, MasterCard and Visa each changed their ownership structures through initial public offerings ("IPOs") wherein the member banks partially divested their ownership of Visa and MasterCard. But the IPOs did not change the essential character of their combinations or the Competitive Restraints. The motivation for these IPOs was to limit the appearance that Visa and MasterCard were controlled by their member banks. According to the prospectus for MasterCard's 2006 IPO, "heightened regulatory scrutiny and legal challenges" underlay the decision to make changes in the ownership structure of MasterCard. In particular, MasterCard stated that "many of the legal and regulatory challenges we face are in part directed at our current ownership and governance structure in which our customers - or member financial institutions - own all of our common stock and are involved in our governance by having representatives serve on our global and regional boards of directors."

2730457v1/101971

57.     After the IPOs, neither Visa, MasterCard, nor any of the member banks took any affirmative action to withdraw from the respective combinations. To the contrary, even after the IPOs, the member banks of Visa and MasterCard continued to agree to and to enforce and adhere to the Competitive Restraints that eliminate competition among issuing banks for merchant acceptance. Visa and MasterCard have continued to set "default" interchange fees for the benefit of their issuing bank members. Thus, even after the IPOs, Visa's and MasterCard's members maintained and enforced the Competitive Restraints ensuring that they would not compete for merchant acceptance.

58.     After the IPOs, as before, Visa and MasterCard serve as facilitators and coordinators of horizontal agreements among their member banks to continue to adhere to and enforce "default" interchange fees and the Competitive Restraints. It would be contrary to the independent self-interest of any single issuing bank to adhere to the Competitive Restraints without the agreement of the remaining issuing banks also to impose and adhere to those restraints. Visa and MasterCard, by acting as the managers of their respective combinations and coordinating agreements to continue imposing and adhering to the Competitive Restraints, eliminate competition for merchant acceptance among their respective issuing banks. But for the arrangements facilitated by Visa and MasterCard, the member banks would pursue their own independent self-interest by competing for merchant acceptance of the cards they issue.

59.     Each issuing bank is an independently owned and independently managed business. Each issuing bank is a separate economic actor pursuing separate economic interests. In other aspects of their businesses, the member banks compete against one another. For example, the banks compete with one another for cardholders by creating payment card products that offer an array of interest rates, annual fees, purchase rewards, and other features that will

2730457v1/101971

make their payment cards more attractive than those offered by other issuing banks. As found in *United States v. Visa U.S.A., Inc.,* cardholders "can choose from thousands of different card products with varying terms and features, including a wide variety of rewards and co-branding programs and services such as automobile insurance, travel and reservation services, emergency medical services and purchase security/extended protection programs." 163 F. Supp. 2d at 334. These facts continue to be true today.

60.     However, the member banks do not compete for merchant acceptance of the cards they issue. Instead, both before and after the Visa and MasterCard IPOs, the member banks have ceded to Visa and MasterCard decision-making and action with respect to the terms upon which they will allow merchants to accept the cards they issue. By continuing to agree to and adhere to the Competitive Restraints and default interchange fees, the member banks have deprived the marketplace of independent centers of decision-making and, therefore, of actual or potential competition.

## THE RELEVANT PRODUCT MARKETS

61.     The relevant product markets are the market for merchant acceptance of general purpose credit (including charge) cards and the market for merchant acceptance of debit cards. Credit cards and debit cards are not reasonably interchangeable with each other or with other forms of tender.

62.     Banks issuing credit and debit cards compete with one another to issue their cards to consumers (cardholders) who use those cards to purchase goods and services from merchants. This competition occurs in the markets for the issuance of credit and debit cards. Absent the Competitive Restraints, banks issuing such cards would seek access to merchants that are willing to accept their cards as payment for the goods and services the merchants sell to consumers. As a

result, absent the Competitive Restraints at issue in this case, issuing banks would compete over the terms of acceptance of their cards by merchants.

63.     Merchant acceptance of general purpose credit cards is a relevant product market. A credit card is not interchangeable with a debit card or other form of tender. Many cardholders desire the ability to access a line of credit, defer payment, or other features offered by the credit cards. For this reason, Plaintiff and other merchants cannot discontinue acceptance of credit cards, even in the face of high or increasing interchange fees, without losing sales. Visa and MasterCard and their credit card issuing members are not constrained in the charges they impose for merchant acceptance of credit cards by the availability of debit cards and other forms of tender as payment options.

64.     Merchant acceptance of debit cards is also a relevant product market. Debit cards are not reasonably interchangeable with credit cards and other forms of tender. Debit cards differ from credit cards in significant ways. Debit cards must be tied to a bank account, or pre-paid, unlike credit cards. When a debit card is used, the funds are withdrawn from the cardholder's account either the same day or within a few days. Consumers who desire to pay for a transaction with immediately available funds may not want to carry large amounts of cash or checks on their person, and not all merchants accept checks. Consumers who cannot qualify for credit cards or have reached the credit limit on their credit cards may also prefer the use of debit cards to other options. Thus, merchants cannot discontinue acceptance of debit cards.

65.     Debit cards are also regulated separately and differently from credit cards. In 2011, pursuant to the Durbin Amendment, the Federal Reserve Board imposed a maximum level for debit card interchange fees charged by large banks. The legislation did not mandate that

Federal Reserve Board regulate interchange fees charged in connection with credit card transactions.

66.     Visa, MasterCard, and their debit card issuing members are not constrained in the charges they impose on merchants for debit card acceptance by the availability of credit cards or other forms of tender as a payment option.

## RELEVANT GEOGRAPHIC MARKET

67.     The relevant geographic market is the United States and its territories.

68.     The default interchange fees are set by Visa and MasterCard, respectively, on a national basis. Similarly, the Competitive Restraints are specific to the United States and its territories.

69.     Plaintiff, along with many other merchants, operates throughout the United States. The Competitive Restraints imposed on them require that they accept all cards of all issuing banks who are members of Visa or of MasterCard at "default" interchange fees at all of their outlets throughout the United States.

70.     Visa and MasterCard, and their largest issuing banks, advertise nationally and pursue promotional strategies aimed at the United States as a whole.

## THE COMPETITIVE RESTRAINTS

71.     On behalf of the issuing banks that are their members, Visa and MasterCard each have adopted and imposed supracompetitive "default" interchange fees and other Competitive Restraints on Plaintiff that eliminate competition. These Competitive Restraints prevent competition among the issuing banks for transaction volume from merchants. As a result, the Competitive Restraints cause Plaintiff's costs of acceptance to be higher than would prevail in a competitive market.

20

72.     Collective Setting of Interchange: Visa and MasterCard set so-called "default" interchange fees on credit card and debit card transactions that merchants are required to pay to their issuing banks. The setting of "default" interchange fees and other Competitive Restraints constitute the fixing of prices within the meaning of the Sherman Act.

73.     Visa and MasterCard each have established complex "default" interchange fee schedules. In setting the interchange fees that are paid to their member banks, Visa and MasterCard each acts as the manager of its respective combination, setting the price that merchants pay for card acceptance. Interchange fees account for the largest portion of merchant costs for accepting such cards.

74.     Interchange fees are not set to recover Visa's or MasterCard's costs of providing network services. Interchange fees are fees that Visa and MasterCard, respectively, acting in combination with the issuing banks, require merchants to pay to the issuing banks.

75.     Visa purports to set non-binding "default" interchange fees. Visa Core Principle No. 10.3 provides that "[i]nterchange reimbursement fees are determined by Visa ... or may be customized where members have set their own financial terms for the interchange of a Visa transaction or Visa has entered into business agreements to promote acceptance and card usage."

76.     MasterCard also purports to set non-binding "default" interchange fees. MasterCard Rule 9.4 provides: "[a] transaction or cash disbursement cleared and settled between Customers gives rise to the payment of the appropriate interchange fee or service fee, as applicable. The Corporation has the right to establish default interchange fees and default service fees (hereafter referred to as 'interchange fees' and 'service fees,' or collectively, 'fees'), it being understood that all such fees set by the Corporation apply only if there is no applicable bilateral interchange fee or service fee agreement between two Customers in place. . .. Unless an

21

applicable bilateral interchange fee or service fee agreement between two Customers is in place, any intraregional or interregional fees established by the Corporation are binding on all Customers."

77.     Acquiring banks that do not deduct the applicable interchange fee when submitting a transaction for authorization, clearance, and settlement are subject to fines assessed by Visa and MasterCard. Both Visa's and MasterCard's rules, quoted above, fix interchange, because the other Competitive Restraints remove any independent competition among issuing banks in the setting of interchange fees.

78.     Absent the Competitive Restraints, Plaintiff would pay interchange fees for acceptance, if at all, as determined by competition among issuing banks for merchant acceptance. In the cartelized markets created by the Visa and MasterCard combinations, Visa and MasterCard, acting for their member banks, establish interchange fee schedules for their member banks. Plaintiff is among the merchants injured by this collective setting of interchange fees by Visa and MasterCard.

79.     Honor All Cards Rules: These rules require in relevant part that a merchant that accepts any Visa-branded or MasterCard-branded credit card must accept all Visa-branded or MasterCard-branded credit cards, no matter which bank issued the card or the card type. Similarly, a merchant that accepts Visa-branded or MasterCard-branded debit cards, must accept all Visa-branded or MasterCard-branded debit cards, no matter the issuing bank. Because of the Honor All Cards Rules, Plaintiff cannot reject any or all of the types of cards issued by any particular issuing bank. Thus, Plaintiff is precluded from gaining the benefits of competition as to the terms upon which they will accept or reject the cards of any issuing bank that is a member of Visa or MasterCard. As a result, the "default" interchange fees become binding on Plaintiff.

2730457v1/101971

80.     All Outlets Rules: The All Outlets Rules require merchants who accept Visa-branded or MasterCard-branded payment cards to accept those cards at all of their merchant locations. A merchant is not permitted to accept the cards at some stores but not others. These rules preclude merchants from gaining the benefits of competition as to the terms of acceptance by location (for example, by region of the country).

81.     Prior to January 27, 2013, the All Outlets Rules required merchants that operated under multiple banners (e.g., trade names or name plates) and that accepted Visa-branded or MasterCard-branded payment cards to accept those cards at all of their banners. This rule precluded merchants from gaining the benefits of competition as to the terms of acceptance with issuing banks by banner or by locations within a banner. As a result, Plaintiff could not indicate they would terminate acceptance of the cards of a particular issuing bank at some of their banners in order to promote competition as to fees.

82.     Changes that Visa and MasterCard made to their All Outlets Rules implemented after January 27, 2013, do not diminish the anticompetitive effects or the injuries Plaintiff continues to suffer. The All Outlets Rules still require that if a merchant elects to accept Visa-branded or MasterCard-branded cards at one of its banners, it must accept all such cards at all locations of that banner, and it must accept all such cards no matter the card issuer. Merchants also cannot accept the cards of some issuers but not others at a particular location.

83.     No Discount Rules: Under the No Discount Rules, merchants were only allowed to offer discounts to customers who paid in cash, rather than using a payment card. However, pursuant to a settlement with the United States Department of Justice, as of July 20, 2011, Visa and MasterCard changed their rules to allow merchants to offer discounts to consumers in some limited circumstances. These changes to the No Discount Rules have not significantly

2730457v1/101971

diminished the anticompetitive effects of the Competitive Restraints. While Visa and MasterCard now allow merchants more discounting options, merchants still are prohibited from offering discounts to consumers for using the cards issued by particular issuing banks. A merchant's ability to utilize issuer-specific discounts would be an important tool for gaining the benefits of competition as to the terms of acceptance with an issuing bank.

84.     No Surcharge Rules: The No Surcharge Rules prohibit Plaintiff from surcharging transactions in which a consumer used a Visa-branded card or a MasterCard-branded card. These rules eliminate a merchant's ability to utilize surcharging as a tool in gaining the benefits of competition as to the terms of acceptance with an issuing bank. Absent the rules, a merchant could surcharge a transaction in which the consumer uses the card of a particular issuing bank, such as one that demanded a high interchange fee. As of January 27, 2013, Visa and MasterCard altered their No Surcharge Rules to permit merchants to surcharge credit card customers under limited circumstances. Debit card transactions still may not be surcharged under the rule modification. Changes to the No Surcharge Rules for credit cards implemented after January 27, 2013 do not eliminate their anticompetitive effects or the injuries Plaintiff continues to suffer. Even as modified, the No Surcharge Rules prohibit a merchant from surcharging based on the identity of the card issuer.

85.     The Competitive Restraints, individually and in combination, eliminate issuing bank competition for merchant acceptance. In the absence of these rules, the market for merchant acceptance would be competitive. Plaintiff and the issuing banks would be able to gain the benefits of competition as to the terms under which Plaintiff would accept an issuing bank's cards, including the amount of interchange fees - if any - Plaintiff would pay on transactions involving an issuing bank's cards. Competition among issuing banks for merchant acceptance

would result in lower interchange fees for Plaintiff and allow it to enhance the value its customers receive.

86.     The Honor All Cards Rules, the No Discount Rules, the No Surcharges Rules, and the All Outlets Rules, individually and in combination, eliminate the incentives for Visa and MasterCard to compete for merchant acceptance through setting lower "default" interchange fees.

87.     In addition to the Competitive Restraints, a variety of other rules and regulations (often not publicly disclosed) enforced by Visa and MasterCard and their member banks also operate to support the anticompetitive effects of the Competitive Restraints and imposition of "default" interchange fees on Plaintiff.

88.     The Competitive Restraints, including the collective setting of "default" interchange fees, are not reasonably necessary to accomplish any legitimate efficiency-generating objectives of the Visa and MasterCard combinations. Furthermore, there exist numerous alternative means that are less harmful to competition by which any such objectives could be accomplished.

## MARKET POWER

89.     Visa and its issuing banks jointly have market power in the relevant market for merchant acceptance of general purpose credit cards in the United States and its territories.

90.     In 2001, in *United States* v. *Visa U.S.A., Inc.,* 163 F. Supp. 2d 322, 341 (S.D.N.Y. *2001), affd,* 344 F.3d 229 (2d Cir. 2003), the court found that Visa had market power in the market for credit card network services with a 47% share of the dollar volume of credit card transactions in the United States. In 2003, in *In re Visa Check/MasterMoney Antitrust Litigation,* 2003 U.S. Dist. LEXIS 4965 (E.D.N.Y. Apr. 1,2003), the court reaffirmed that Visa had market

power in the credit card market based on a finding that its market share fluctuated between 43% and 47%, as well as the barriers to entering the relevant product market. Visa's share of the credit card market has not changed significantly since these two holdings. The prior judicial findings of market power demonstrate that Visa has market power in the general purpose credit card market.

91.     There are significant barriers to entry into the market for general purpose credit cards. Indeed, the court in *United States* v. *Visa U.S.A., Inc.,* 163 F. Supp. 2d 322, 341 (S.D.N.Y. *2001), affd,* 344 F.3d 229 (2d Cir. 2003), specifically found that there are high barriers to entry into the general purpose credit card market. Visa's former CEO described starting a new card network as a "monumental" task involving expenditures and investment of over $1 billion. Both AT&T and Citibank conducted entry analyses, but decided it would be unprofitable to attempt to start a competing general purpose credit card business.

92.     The difficulties associated with entering the network market are exemplified by the fact that no company has entered since Discover did so in 1985. Discover has never achieved more than a 7% share of the general purpose credit card market and its current share is approximately 5%.

93.     Visa's conduct is direct evidence of its market power and that of its issuing banks. Interchange fees are set by Visa on behalf of its issuing banks. Visa promulgates and enforces the Competitive Restraints, which prevent competition among its issuing banks for merchant acceptance. Absent the Competitive Restraints, Visa's credit card issuing banks would gain the benefits of competition as to the terms of merchant acceptance, including interchange fees, and Plaintiff would benefit through lower interchange fees and other benefits from competition.

94.     Visa's "default" credit interchange fees demonstrate Visa's market power. Effective credit card interchange fees have risen over time, even as the costs of issuing credit cards have fallen for its member banks and even as interchange fees for debit cards have fallen. Despite these increases, merchants have not stopped accepting Visa credit cards. Further, Visa's market power is demonstrated by its ability to discriminate in price among types of merchants, by distinguishing merchants by size, transactions by size, cards by type, and merchants by retail category.

95.     Visa's market power in credit cards is also demonstrated by the fact that when the Federal Reserve Board significantly reduced the interchange fees on debit transactions, few if any merchants chose to stop accepting Visa credit cards, and Visa did not reduce its credit card interchange fees. In 2012, the first full year after implementation of reduced interchange fees on debit transactions, Visa credit card transactions and purchase volume increased.

96.     Competition with MasterCard does not eliminate Visa's exercise of market power in the market for merchant acceptance of general purpose credit cards. During the period that Visa and MasterCard were both joint ventures consisting of their member banks, they adopted parallel rules that limited competition for merchant acceptance. After their respective IPOs, Visa's and MasterCard's membership, rules, and their power to obtain high interchange fees from merchants have not changed and continue to constrain competition between Visa and MasterCard and among the members of both combinations.

97.     MasterCard and its issuing banks jointly have market power in the relevant market for merchant acceptance of general purpose credit cards in the United States.

98.     In *United States* v. *Visa U.S.A., Inc.,* 163 F. Supp. 2d 322, 341 (S.D.N.Y. 2001), *affd,* 344 F.3d 229 (2d Cir. 2003), the court held that MasterCard's 26% share of dollar volume

of credit and charge card transactions was sufficient to demonstrate that it had market power in the market for credit card network services. In *In re Visa Check/MasterMoney Antitrust Litigation,* 2003 U.S. Dist. LEXIS 4965 (E.D.N.Y. Apr. 1, 2003), the court held that MasterCard's 26% to 28% share of the credit card market was sufficiently high to go to a jury on the question of MasterCard's market power. MasterCard's share of the credit card market has not changed significantly since those decisions.

99.     MasterCard's conduct is direct evidence of its market power and that of its issuing banks. Interchange fees are set by MasterCard on behalf of its issuing banks. MasterCard also promulgates and enforces the Competitive Restraints, which prevent competition among its issuing banks for merchant acceptance. Absent the Competitive Restraints, MasterCard's credit card issuing banks would gain the benefits of competition as to the terms of merchant acceptance, including interchange fees, and Plaintiff would benefit through lower interchange fees and other benefits from competition.

100.     MasterCard's "default" credit interchange fees demonstrate MasterCard's market power. Effective credit card interchange fees have risen over time, even as the costs of issuing credit cards have fallen for its member banks and even as interchange fees for debit cards have fallen. Despite these increases, merchants have not stopped accepting MasterCard credit cards. Further, MasterCard's market power is demonstrated by its ability to discriminate in price among types of merchants, by distinguishing merchants by size, transactions by size, cards by type, and merchants by retail category.

101.     Competition with Visa does not eliminate MasterCard's exercise of market power in the market for merchant acceptance of general purpose credit cards either. During the period that Visa and MasterCard were joint ventures consisting of their member banks, they adopted

2730457v1/101971

rules that limited competition for merchant acceptance. After their respective IPOs, Visa's and MasterCard's membership, rules, and most importantly power to obtain high interchange fees from merchants did not change and continue to constrain competition between Visa and MasterCard and among the members of both combinations.

102.   As alleged above, there are significant barriers to entry into the market for the provision of general purpose payment card network services to merchants.

103.   The debit card market is dominated by Visa and MasterCard. Combined, Visa and MasterCard comprised about 75% of all debit purchase volume in 2004 and comprise over 80% today. Only Visa, MasterCard, and Discover allow signature authorization of debit transactions.

104.   Visa, jointly with its issuing banks, and MasterCard, jointly with its issuing banks, each exercise market power in the market for merchant acceptance of debit cards.

105.   Visa and its issuing banks jointly have market power in the market for acceptance of debit cards. Visa participates in and manages a combination comprised of the vast majority of issuing banks of debit cards, such that merchants are unable to refuse to accept Visa-branded debit cards. This combination of issuing banks combined with the Competitive Restraints gives Visa market power. Visa has exercised and continues to exercise market power by requiring Plaintiff to pay supracompetitive interchange fees and by imposing the Competitive Restraints.

106.   Visa's market power over merchants is demonstrated by the fact that, when the tie forcing merchants to accept Visa debit cards as a condition of accepting Visa credit cards was dropped in 2003, there is no evidence that merchants were able to stop accepting Visa debit cards despite the availability of lower cost PIN debit networks. In addition, in 2011 the Federal Reserve Board found that Visa's debit interchange rates were significantly above cost. Because

of Visa's Competitive Restraints, merchants cannot gain the benefits of competition among issuing banks for terms of debit card acceptance.

107.    MasterCard and its issuing banks jointly have market power in the market for acceptance of debit cards. MasterCard participates in and manages a combination comprised of a significant fraction of all issuers of debit cards, such that merchants are unable to refuse to accept MasterCard-branded debit cards. This combination of issuing banks combined with the Competitive Restraints gives MasterCard market power. MasterCard has exercised and continues to exercise market power by requiring Plaintiff to pay supracompetitive interchange fees and by imposing the Competitive Restraints.

108.    MasterCard's market power over merchants is demonstrated by the fact that, when the tie forcing merchants to accept MasterCard debit cards as a condition of accepting MasterCard credit cards was dropped in 2003, few or no merchants stopped accepting MasterCard debit cards despite the availability of lower cost PIN debit networks. In addition, in 2011 the Federal Reserve Board found that MasterCard's debit interchange rates were significantly above cost. Because of MasterCard's Competitive Restraints, merchants cannot gain the benefits of competition among issuing banks for terms of debit card acceptance.

## COMPETITIVE INJURY

109.    Visa and MasterCard use their market power to impose "default" interchange fees and the Competitive Restraints on Plaintiff.

110.    The Competitive Restraints make it impossible for the Plaintiff to gain the benefits of competition as to the terms of acceptance, including lower interchange fees with individual issuing banks. The Competitive Restraints provide a mechanism for issuing banks to avoid competing for acceptance. Absent the supracompetitive "default" interchange fees and the

other Competitive Restraints, Plaintiff would be able to gain the benefits of competition as to interchange fees, which would reduce them to a competitive level. The changes to the Competitive Restraints that were instituted as a result of prior settlements and enforcement actions have not eliminated the market power of the combinations and have not curtailed the level or rise in effective interchange fees being paid by merchants.

111.   Plaintiff has been harmed by the actions of the Visa and MasterCard combinations. The amount of interchange fees paid by Plaintiff is supracompetitive. The high interchange fees levied on Plaintiff lead to increased merchandise prices for consumers or otherwise diminish the value their customers receive. Thus, consumers, as well as merchants such as Plaintiff, are harmed by the combinations' anticompetitive conduct, including the imposition of "default" interchange fees.

112.   But for the Competitive Restraints, competition among issuing banks for merchant acceptance would result in lower interchange fees. Plaintiff would have the opportunity to use the strategies it uses in other parts of its business to obtain competitive acceptance terms. As a result of the Competitive Restraints, card acceptance is a significant cost to Plaintiff's businesses and Plaintiff has no ability to gain lower costs in a competitive market.

113.   From 2004 to the present, Buc-ee's has accepted Visa-branded and MasterCard branded credit and debit cards. Accordingly, Buc-ee's has been forced to abide by Visa's and MasterCard's unlawful Competitive Restraints and has been forced to pay supracompetitive interchange fees, all to its detriment.

2730457v1/101971

## CLAIMS FOR RELIEF

**Count 1: Violation of Section 1 of the Sherman Act, Collectively and Separately, by Visa and Chase Defendants Regarding Competitive Restraints Governing Credit Cards**

114.   Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

115.   The use of credit cards issued by members of Visa and the rules governing the use of such cards occur in and have a substantial anticompetitive effect on interstate commerce.

116.   Visa and its Member Banks are a combination within the meaning of Section 1 of the Sherman Act. Visa's rules and related contracts constitute agreements within the meaning of Section 1 of the Sherman Act. Visa's Competitive Restraints, as defined above, constitute horizontal agreements among Visa and its members both prior to and after Visa's reorganization and IPO. Visa has served and continues to serve as the manager of a combination that limits competition among the bank members of the combination through the rules governing credit cards agreed to by Visa members. Accordingly, by these arrangements, Visa has facilitated and continues to facilitate a horizontal agreement among its members, which would otherwise compete for merchant acceptance of the credit cards each issues. It would be contrary to the independent self-interest of individual issuing banks to forgo the ability to compete for merchant acceptance in the absence of an agreement with other issuing banks, managed by Visa, similarly not to compete. Visa and its Member Banks,  including the Chase Defendants, have engaged in unlawful contracts, combinations, and conspiracies in an unreasonable restraint of interstate trade or commerce in violation of Section 1 of the Sherman Act.

117.   The unlawful contracts, combinations, and conspiracies consisted of continuing agreements, understandings and concerts of action between and among Visa's issuing and acquiring members including the Chase Defendants and Visa, the substantial terms of which

32

were to illegally fix, raise, maintain, or stabilize the Credit Card Interchange Fees that are imposed on Merchants in the market for general purpose card network services.

118.    The Visa Board of Directors, which included representatives from several Bank Defendants, acted on behalf of the Member Banks to fix, raise, maintain, or stabilize the Interchange Fees for Visa transactions, in violation of Section 1 of the Sherman Act.

119.    All of the Member Banks of Visa, including the Chase Defendants, have actual knowledge of, and have knowingly participated in, the conspiracy alleged herein.

120.    In addition, Visa's rules and related contracts entered into before the Visa IPO constituted a horizontal agreement from which Visa and the member banks have never withdrawn. In changing its corporate form at the time of the IPO, Visa did not take any affirmative action to end its existing anticompetitive arrangements, either by communicating to its members a decision to withdraw from the rules and agreements with its members or by taking any other steps to effectuate withdrawal from the rules and agreements. Nor did its members take any steps to withdraw from the rules and agreements or take any other steps to effectuate withdrawal from the rules and agreements.

121.    Alternatively, after the Visa IPO, the Competitive Restraints constitute vertical agreements in restraint of trade.

122.    As alleged above, Visa and its members jointly have market power in the market for merchant acceptance of general purpose credit cards.

123.    Individually and in combination, the Competitive Restraints constitute an illegal agreement to fix the price of acceptance of Visa-branded credit cards and to prevent the operation of and interfere with the competitive process with respect to the acceptance of Visa-branded credit cards, in violation of Section 1 of the Sherman Act.

2730457v1/101971

124.    Visa's Honor All Cards Rules support the illegal price-fixing arrangement by eliminating the ability of merchants to gain the benefits of competition among individual issuing banks. Under the Honor All Cards Rules, Visa affords merchants no choice but to accept Visa-branded cards from its issuing banks on an all-or-nothing basis. Each issuing bank's cards, however, are separate products that consumers choose among based upon competition in terms among the issuing banks with respect to the individual terms and characteristics of those cards. The Honor All Cards Rules eliminate merchant acceptance as one of the areas of competition among issuing banks. By unlawfully forcing merchants to accept the Visa-branded cards of all issuing banks, the Honor All Cards Rule has the effect of fixing the price of acceptance paid by merchants. But for the Honor All Cards Rule, competition among issuing banks for acceptance by merchants would lower the cost of acceptance.

125.    Visa's other Competitive Restraints, described above, further eliminate competition by removing the ability of merchants to gain the benefits of competition as to the fees paid to particular issuing banks. This further eliminates merchant acceptance as one of the areas of competition among issuing banks. Absent these rules, merchants would have been able to (and would continue to be able to) use a variety of competitive strategies, ranging from not accepting the cards of certain issuing banks or not accepting certain card types at certain locations, to offering benefits to consumers tendering certain card types of certain issuing banks. But for the Competitive Restraints, competition among issuing banks for acceptance, or favorable terms of acceptance, by merchants would lower the cost of acceptance for credit cards.

126.    Visa's setting of "default" interchange fees for the acceptance of Visa-branded credit cards further prevents the cost of acceptance from being determined between Plaintiff and the various individual issuing banks in a competitive market. Instead, Visa's supracompetitive

interchange fees are set collectively by Visa in conjunction with or on behalf of all of its member issuing banks. Absent the setting of "default interchange" fees for Visa-branded credit cards by Visa and the other Competitive Restraints managed by Visa, issuing banks would compete for acceptance by lowering the cost of acceptance of the cards for each Issuer.

127.    As alleged above, Plaintiff has suffered antitrust injury as a result of the illegal restraints on the costs charged for acceptance of credit cards by merchants, which are the result of Visa's Competitive Restraints. The effect of these restraints has been to increase the cost of acceptance of credit cards paid by Plaintiff, thereby injuring both Plaintiff and consumers through higher costs and decreased consumer welfare.

128.    The collectively fixed Interchange Fees are illegal. They are not necessary to accomplish any procompetitive benefits of the Visa Network. Even if some horizontal agreement were necessary to promote the efficiencies of the Visa Network, the collectively-set Interchange Fee is significantly more restrictive than necessary to bring about those efficiencies.  Visa and its' Member Banks' price fixing achieves few – if any – procompetitive benefits to counterbalance the price-fixing's demonstrated anticompetitive effects in the General Purpose Card Network Services market.

### Count 2: Violation of Section 1 of the Sherman Act, Collectively and Separately, by Visa and the Chase Defendants Regarding Competitive Restraints Governing Debit Cards

129.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

130.    The use of debit cards issued by Member Banks of Visa and the rules governing the use of such cards occur in and have a substantial anticompetitive effect on interstate commerce.

35

131.    Visa and its Member Banks are a combination within the meaning of Section 1 of the Sherman Act. Visa's rules and related contracts constitute agreements within the meaning of Section 1 of the Sherman Act. Visa's Competitive Restraints, as defined above, constitute horizontal agreements among Visa and its members both prior to and after Visa's reorganization and IPO. Visa has served and continues to serve as the manager of a combination that limits competition between the bank members of the combination through the rules governing debit cards agreed to by Visa members. Accordingly, by these arrangements, Visa has facilitated and continues to facilitate a horizontal agreement among its members, which would otherwise compete for merchant acceptance of the debit cards each issues. It would be contrary to the independent self-interest of individual issuing banks to forgo the ability to compete for merchant acceptance in the absence of an agreement with other issuing banks, managed by Visa, similarly not to compete.

132.    Throughout the relevant period, Visa and Member Banks – direct horizontal competitors of each other – engaged in unlawful contracts, combinations, and conspiracies in an unreasonable restraint of interstate trade or commerce in violation of Section 1 of the Sherman Act.

133.    The Visa Board of Directors, which includes representatives from several Member Banks, acted on behalf of the Member Banks to fix, raise, maintain, or stabilize the Interchange fees for debit card transactions, in violation of Section 1 of the Sherman Act.

134.    All of the Chase Defendants have actual knowledge of, and have knowingly participated in, the conspiracy alleged in.

135.    In addition, Visa's rules and related contracts entered into before the Visa IPO constituted a horizontal agreement from which Visa and the member banks have never

36

withdrawn. In changing its corporate form at the time of the IPO, Visa did not take any affirmative action to end its existing anticompetitive arrangements, either by communicating to its members a decision to withdraw from the rules and agreements with its members or by taking any other steps to effectuate withdrawal from the rules and agreements. Nor did its members take any steps to withdraw from the rules and agreements or take any other steps to effectuate withdrawal from the rule and agreements.

136.    Alternatively, after the Visa IPO, the Competitive Restraints constitute vertical agreements in restraint of trade.

137.    As alleged above, Visa and its members jointly have market power in the market for merchant acceptance of debit cards.

138.    Individually and in combination, the Competitive Restraints constitute an illegal agreement to fix the price of acceptance of Visa-branded debit cards and to prevent the operation of and interfere with the competitive process with respect to the acceptance of debit cards, in violation of Section 1 of the Sherman Act.

139.    Visa's Honor All Cards Rules support the illegal price-fixing arrangement by eliminating the ability of merchants to gain the benefits of competition among individual issuing banks. Under the Honor All Cards Rules, Visa affords merchants no choice but to accept cards from its issuing banks on an all-or-nothing basis. Each issuing bank's cards, however, are separate products that consumers choose among based upon competition in terms among the issuing banks with respect to the individual terms and characteristics of those cards. The Honor All Cards Rules eliminate merchant acceptance as one of the areas of competition among issuing banks. By unlawfully forcing merchants to accept the Visa-branded cards of all issuing banks, the Honor All Cards Rule has the effect of fixing the price of acceptance paid by merchants. But

2730457v1/101971

for the Honor All Cards Rule, competition among issuing banks for acceptance by merchants would lower the cost of acceptance.

140.    Visa's other Competitive Restraints, described above, further eliminate competition by removing the ability of merchants to gain the benefits of competition as to fees paid to particular issuing banks. Absent these rules, merchants would have been able to (and would continue to be able to) use a variety of competitive strategies, ranging from not accepting the cards of certain issuing banks or not accepting certain card types at certain locations, to offering benefits to consumers tendering certain card types of certain issuing banks. But for the Competitive Restraints, competition among issuing banks for acceptance, or favorable terms of acceptance, by merchants would lower the cost of acceptance for debit cards.

141.    Visa's setting of "default" interchange fees for the acceptance of Visa-branded debit cards further prevents the cost of acceptance from being determined between Plaintiff and the various individual issuing banks in a competitive market. Instead, Visa's supracompetitive interchange fees have been set collectively by Visa in conjunction with or on behalf of all of its member issuing banks. Absent the setting of "default" interchange fees for Visa-branded debit cards by Visa and the other Competitive Restraints managed by Visa, issuing banks would compete for acceptance by lowering the cost of acceptance of the cards for each issuing bank.

142.    The maximum debit interchange fees enacted by the Federal Reserve as a result of the Durbin Amendment have not eliminated the anticompetitive effects of Visa's setting of "default" interchange fees. While the damages suffered by Plaintiff because of the imposition of supracompetitive debit interchange fees may be reduced by the regulatory maximums, the interchange fees being levied on Plaintiff by the combination are still higher than they would be if there were active competition for merchant acceptance. Accordingly, even after the enactment

of maximum levels for debit interchange fees, Plaintiff continues to suffer damage by being forced to pay supracompetitive interchange fees on Visa debit card transactions.

143.     As alleged above, Plaintiff has suffered antitrust injury as a result of the illegal restraints on the costs charged for acceptance of debit cards by merchants, which are the result of Visa's Competitive Restraints. The effect of these restraints has been to increase the cost of acceptance of debit cards paid by Plaintiff, thereby injuring both Plaintiff and consumers through higher costs and increased prices.

144.     The collectively fixed Interchange Fees are illegal. They are not necessary to accomplish any procompetitive benefits of the Visa Network. Even if some horizontal agreement were necessary to promote the efficiencies of the Visa Network, the collectively-set Interchange Fee is significantly more restrictive than necessary to bring about those efficiencies.  Visa and its' Member Banks' price fixing achieves few – if any – procompetitive benefits to counterbalance the price-fixing's demonstrated anticompetitive effects in the debit card market.


**Count 3: Violation of Section 1 of the Sherman Act, Collectively and Separately, By MasterCard and the Chase Defendants Regarding Competitive Restraints Governing Credit Cards**

145.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

146.     The use of credit cards issued by members of MasterCard and the rules governing the use of such cards occur in and have a substantial anticompetitive effect on interstate commerce.

147.     MasterCard and its member banks are a combination within the meaning of Section 1 of the Sherman Act. MasterCard's rules and related contracts constitute agreements

within the meaning of Section 1 of the Sherman Act. MasterCard's Competitive Restraints, as defined above, constitute horizontal agreements among MasterCard and its members both prior to and after MasterCard's IPO. MasterCard has served and continues to serve as the manager of a combination that limits competition among the bank members of the combination through the rules governing credit cards agreed to by MasterCard members. Accordingly, by these arrangements, MasterCard has facilitated and continues to facilitate a horizontal agreement among its members, which would otherwise compete for merchant acceptance of the credit cards each issues. It would be contrary to the independent self-interest of individual issuing banks to forgo the ability to compete for merchant acceptance in the absence of an agreement with other issuing banks, managed by MasterCard, similarly not to compete. MasterCard and its Member Banks, including the Chase Defendants, have engaged in unlawful contracts, combinations, and conspiracies in an unreasonable restraint of interstate trade or commerce in violation of Section 1 of the Sherman Act.

148.    The unlawful contracts, combinations, and conspiracies consisted of continuing agreements, understandings and concerts of action between and among MasterCard's issuing and acquiring members including the Chase Defendants and MasterCard, the substantial terms of which were to illegally fix, raise, maintain, or stabilize the Credit Card Interchange Fees that are imposed on Merchants in the market for General Purpose Card Network Card Services.

149.    The MasterCard Board of Directors, which included representatives from several Chase Defendants, acted on behalf of the Member Banks to fix, raise, maintain, or stabilize the Interchange Fees for MasterCard transactions, in violation of Section 1 of the Sherman Act.

150.    All of the Member Banks of MasterCard, including the Chase Defendants, have actual knowledge of, and have knowingly participated in, the conspiracy alleged herein.

40

151.   In addition, MasterCard's rules and related contracts entered into before the MasterCard IPO constituted a horizontal agreement from which MasterCard and the member banks have never withdrawn. In changing its ownership structure at the time of the IPO, MasterCard did not take any affirmative action to end its existing anti-competitive arrangements, either by communicating to its members a decision to withdraw from the rules and agreements with its members or by taking any other steps to effectuate withdrawal from the rules and agreements. Nor did its members take any steps to withdraw from the rules and agreements or take any other steps to effectuate withdrawal from the rules and agreements.

152.   Alternatively, after the MasterCard IPO, the Competitive Restraints constitute vertical agreements in restraint of trade.

153.   As alleged above, MasterCard and its members jointly have market power in the market for merchant acceptance of general purpose credit cards.

154.   Individually and in combination, the Competitive Restraints constitute an illegal agreement to fix the price of acceptance of MasterCard-branded credit cards and to prevent the operation of and interfere with the competitive process with respect to the acceptance of credit cards, in violation of Section 1 of the Sherman Act.

155.   MasterCard's Honor All Cards Rules support the illegal price-fixing arrangement by eliminating the ability of merchants to gain the benefits of competition among individual issuing banks. Under the Honor All Cards Rules, MasterCard affords merchants no choice but to accept cards from its issuing banks on an all-or-nothing basis. Each issuing bank's cards, however, are separate products that consumers choose among based upon competition in terms among the issuing banks with respect to the individual terms and characteristics of those cards. The Honor All Cards Rules eliminate merchant acceptance as one of the areas of competition

41

among issuing banks. By unlawfully forcing merchants to accept the MasterCard-branded cards of all issuing banks, the Honor All Cards Rule has the effect of fixing the cost of acceptance paid by merchants. But for the Honor All Cards Rule, competition among issuing banks for acceptance by merchants would lower the cost of acceptance.

156.   MasterCard's other Competitive Restraints, described above, further eliminate competition by removing the ability of merchants to gain the benefits of competition as to the fees paid to particular issuing banks. Absent these rules, merchants would have been able to (and would continue to be able to) use a variety of competitive strategies, ranging from not accepting the cards of certain issuing banks or not accepting certain card types at certain locations, to offering benefits to consumers tendering certain card types of certain issuing banks.  But for the Competitive Restraints, competition among issuing banks for acceptance, or favorable terms of acceptance, by merchants would lower the cost of acceptance for credit cards.

157.   MasterCard's setting of "default" interchange fees for the acceptance of MasterCard-branded credit cards further prevents the cost of acceptance from being determined between Plaintiff and the various individual issuing banks in a competitive market. Instead, MasterCard's supracompetitive interchange fees are set collectively by MasterCard in conjunction with or on behalf of all of its member issuing banks. Absent the setting of "default" interchange fees for MasterCard-branded credit cards by MasterCard and the other Competitive Restraints managed by MasterCard, issuing banks would compete for acceptance by lowering the cost of acceptance of the cards for each issuing bank.

158.   As alleged above, Plaintiff has suffered antitrust injury as a result of the illegal restraints on the costs charged for acceptance of credit cards by merchants, which are the result of MasterCard's Competitive Restraints. The effect of these restraints has been to increase the

42

cost of acceptance of credit cards paid by Plaintiff, thereby injuring both Plaintiff and consumers through higher costs and increased prices.

159.   The collectively fixed Interchange Fees are illegal. They are not necessary to accomplish any procompetitive benefits of the Visa Network. Even if some horizontal agreement were necessary to promote the efficiencies of the Visa Network, the collectively-set Interchange Fee is significantly more restrictive than necessary to bring about those efficiencies.  Visa and its' Member Banks' price fixing achieves few – if any – procompetitive benefits to counterbalance the price-fixing's demonstrated anticompetitive effects in the General Purpose Card Network Services market.

### Count 4: Violation of Section 1 of the Sherman Act, Collectively and Separately, By MasterCard and the Chase Defendants Regarding Competitive Restraints Governing Debit Cards

160.   Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

161.   The use of debit cards issued by members of MasterCard and the rules governing the use of such cards occur in and have a substantial anticompetitive effect on interstate commerce.

162.   Throughout the relevant period, MasterCard and its Member Banks, including the Chase Defendants – direct horizontal competitors of each other – engaged in unlawful contracts, combinations, and conspiracies in an unreasonable restraint of interstate trade or commerce in violation of Section 1 of the Sherman Act.

163.   The MasterCard Board of Directors, which includes representatives from several Chase Defendants, acted on behalf of the Member Banks to fix, raise, maintain, or stabilize the

2730457v1/101971

Interchange fees for MasterCard debit card transactions, in violation of Section 1 of the Sherman Act.

164.    MasterCard and its member banks are a combination within the meaning of Section 1 of the Sherman Act. MasterCard's rules and related contracts constitute agreements within the meaning of Section 1 of the Sherman Act. MasterCard's Competitive Restraints, as defined above, constitute horizontal agreements among MasterCard and its members both prior to and after MasterCard's IPO. MasterCard has served and continues to serve as the manager of a combination that limits competition among the bank members of the combination through the rules governing debit cards agreed to by MasterCard members. Accordingly, by these arrangements, MasterCard has facilitated and continues to facilitate a horizontal agreement among its members, which would otherwise compete for merchant acceptance of the debit cards each issues. It would be contrary to the independent self-interest of individual issuing banks to forgo the ability to compete for merchant acceptance in the absence of an agreement with other issuing banks, managed by MasterCard, to similarly not compete.

165.    In addition, MasterCard's rules and related contracts entered into before the MasterCard IPO constituted a horizontal agreement from which MasterCard and the member banks have never withdrawn. In changing its ownership structure at the time of the IPO, MasterCard did not take any affirmative action to end its existing anticompetitive arrangements, either by communicating to its members a decision to withdraw from the rules and agreements with its members or by taking any other steps to effectuate withdrawal from the rules and agreements. Nor did its members take any steps to withdraw from the rules and agreements or take any other steps to effectuate withdrawal from the rules and agreements.

2730457v1/101971

166. Alternatively, after the MasterCard IPO, the Competitive Restraints constitute vertical agreements in restraint of trade.

167. As alleged above, MasterCard and its members jointly have market power in the market for merchant acceptance of debit cards.

168. Individually and in combination, the Competitive Restraints constitute an illegal agreement to fix price of acceptance of MasterCard-branded debit cards and to prevent the operation of and interfere with the competitive process with respect to the acceptance of debit cards, in violation of Section 1 of the Sherman Act.

169. MasterCard's Honor All Cards Rules support the illegal price-fixing arrangement by eliminating the ability of merchants to gain the benefits of competition among individual issuing banks. Under the Honor All Cards Rules, MasterCard affords merchants no choice but to accept MasterCard-branded cards from its issuing banks on an all-or-nothing basis. Each issuing bank's cards, however, are separate products that consumers choose among based upon competition in terms among the issuing banks with respect to the individual terms and characteristics of those cards. The Honor All Cards Rules eliminate merchant acceptance as one of the areas of competition among issuing banks. By unlawfully forcing merchants to accept the MasterCard-branded cards of all issuing banks, the Honor All Cards Rule has the effect of fixing the prices of acceptance paid by merchants. But for the Honor All Cards Rule, competition among issuing banks for acceptance by merchants would lower the cost of acceptance.

170. MasterCard's Competitive Restraints, described above, further eliminate competition by removing the ability of merchants to gain the benefits of competition as to fees paid to particular issuing banks. Absent these rules, merchants would have been able to (and would continue to be able to) use a variety of competitive strategies, ranging from not accepting

45

the cards of certain issuing banks or not accepting certain card types at certain locations, to offering benefits to consumers tendering certain card types of certain issuing banks. But for the Competitive Restraints, competition among issuing banks for acceptance, or favorable terms of acceptance, by merchants would lower the cost of acceptance for debit cards.

171.    MasterCard's setting of default interchange fees for the acceptance of MasterCard-branded debit cards further prevents the cost of acceptance from being determined between Plaintiff and the various individual issuing banks in a competitive market. Instead, MasterCard's supracompetitive interchange fees are set collectively by MasterCard in conjunction with or on behalf of all of its member issuing banks. Absent the setting of "default" interchange fees for MasterCard-branded debit cards by MasterCard and the other Competitive Restraints managed by MasterCard, issuing banks would compete for acceptance by lowering the cost of acceptance of the cards for each issuing bank.

172.    The maximum debit interchange fees enacted by the Federal Reserve as a result of the Durbin Amendment have not eliminated the anticompetitive effects of MasterCard's setting of "default" interchange fees. While the damages suffered by Plaintiff because of the imposition of supracompetitive debit interchange fees may be reduced by regulatory maximums, the interchange fees being levied on Plaintiff by the combination are still higher than they would be if there was active competition for merchant acceptance. Accordingly, even after the enactment of maximum levels for debit interchange fees, Plaintiff continue to suffer damage by being forced to pay supracompetitive interchange fees on MasterCard debit card transactions.

173.    As alleged above, Plaintiff has suffered antitrust injury as a result of the illegal restraints on the costs charged for acceptance of debit cards by merchants, which are the result of MasterCard's Competitive Restraints. The effect of these restraints has been to increase the cost

of acceptance of debit cards paid by Plaintiff, thereby injuring both Plaintiff and consumers through higher costs and increased prices.

174.   The collectively fixed Interchange Fees are illegal. They are not necessary to accomplish any procompetitive benefits of the MasterCard Network. Even if some horizontal agreement were necessary to promote the efficiencies of the MasterCard Network, the collectively-set Interchange Fee is significantly more restrictive than necessary to bring about those efficiencies.   Visa and its' Member Banks' price fixing achieves few – if any – procompetitive benefits to counterbalance the price-fixing's demonstrated anticompetitive effects in the debit card market.

### Count 5: Violation of Section 1 of the Sherman Act
### by Visa, MasterCard and the Chase Defendants

175.   Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

176.   Visa and MasterCard, together with the Chase Defendants and other Member Banks, have colluded with the purpose to, and the effect of, fixing, raising, maintaining, or stabilizing Credit Card Interchange Fees in the market for General Purpose Card Network Services at similar supracompetitive levels, and have agreed not to reduce such Interchange Fees.

177.   Visa and MasterCard consciously engaged in parallel conduct at the direction of the Chase Defendants and other Member Banks with respect to Interchange Fees and other conduct that supports the inference of the above-described agreement. In addition to the consciously-parallel conduct, the Defendants' conduct exhibits the following "plus factors," among others, which support an inference of the existence of the above-described agreement:

a.   Many of the same Member Banks issue both Visa and MasterCard Payment Cards, which provides fertile ground for collusion between the two Networks. A high level of communication regarding Interchange Fees, other fees, and

        promotions, exists between and among Visa and MasterCard, both directly and through the Member Banks, including Chase;

b.      The Interchange-Fee setting activities of Visa are transparent to MasterCard and its Member Banks and vice versa;

c.      The Network Services that Visa, MasterCard, and their Member Banks provide to Merchants are indistinguishable from each other;

d.      Credit-Card Interchange fees for both Visa and MasterCard move in parallel and stair-step fashion. Virtually without exception, an increase in Interchange Fees by one Association was met with an increase by the other;

e.      The Chase Defendants and other Member Banks of Visa and MasterCard have a profit motive to ensure that the Interchange Fees of both Networks increase in parallel and stair-step fashion;

f.      But for the conspiracy between Visa and MasterCard, neither Network would have had an incentive to match a price increase by the other Network; and

g.      Both Visa and MasterCard each have substantial market power and have the incentive and ability to maintain Interchange Fees at supracompetitive levels to protect their profits from competition from each other.

h.      The Member Banks of Visa and MasterCard have caused each Network to adopt the Competitive Restraints. The effect of these Restraints is such that the usual competitive mechanism of sellers offering a lower price to generate more sales is ineffective. Thus, Visa, MasterCard and their Member Banks have structured the market such that there is no incentive for Issuers to offer Merchants lower Interchange Fees.

i.       Both Visa and MasterCard have instituted, announced, and publicized policies that they will not be "competitively disadvantaged" with respect to Interchange Fees, which provides assurances to each Network that an Interchange Fee increase by it will be met by an equally substantial increase by the other Network.

178.    Visa, MasterCard, the Chase Defendants, and their Co-Conspirators achieved their anticompetitive objectives, in part, by agreeing, separately and together, to establish, implement and maintain a price fixing scheme whereby they fixed supracompetitive Credit-Card Interchange Fees in the market for General Purpose Card Network Services.

179.    The conspiracy by Visa and MasterCard to fix, raise, maintain, or stabilize the price of Credit Card Interchange Fees to be imposed on Merchants in the market for General

Purpose Card Network Services has had the following intended and actual anti-competitive effects: actual and potential competition in the General Purpose Card Network Services markets was substantially excluded, suppressed, and effectively foreclosed; Defendants acquired and maintained market power in the relevant markets; Defendants controlled, maintained, and elevated above competitive levels the Credit Card Interchange Fees imposed on Plaintiff resulting in Plaintiff paying supracompetitive Credit Card Interchange Fees to Issuing Banks.

180.    Defendants derived direct and substantial economic benefits from the supracompetitive Credit Card Interchange Fees charged to Plaintiff in an amount to be determined at trial.

181.    These restraints of competition are illegal *per se*. They are not reasonably related to the operations of the Visa and MasterCard networks and even if they were reasonably necessary, they are broader than necessary to effectuate the business of Visa and MasterCard.

### Count 6: Violation of Cartwright Act
### by Visa, Chase and Other Member Banks Regarding Credit Cards

182.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

183.    Until its reorganization and IPO, Visa and its Member Banks, including the Chase Defendants — direct, horizontal competitors of each other — engaged in unlawful contracts, combinations, and conspiracies in an unreasonable restraint of interstate trade or commerce in violation of § 16700 *et seq.* of the Cartwright Act (Cal. Bus. & Prof. Code, § 16700 *et seq.*). A substantial part of the acts constituting these unlawful contracts, combinations, and conspiracies took place  within the State of California.

184.    The unlawful contracts, combinations, and conspiracies consisted of continuing agreements, understandings, and concerts of action between and among Visa's issuing and

49

acquiring members, including the Chase Defendants and Visa, the substantial terms of which were to illegally fix, raise, maintain, or stabilize the Credit Card Interchange Fees charged to Merchants by Issuing Banks in the market for General Purpose Card Network Services.

185.    139. The Visa Board of Directors, which included representatives from the Chase Defendants, voted to fix, raise, maintain, or stabilize the Credit Card Interchange Fees for Visa transactions, in violation of § 16700 *et seq.* of the Cartwright Act.

186.    All of the Member Banks of Visa, including the Chase Defendants, have had actual knowledge of, and have knowingly participated in, the conspiracy alleged herein.

187.    The contract, combination, conspiracy, and agreement has had, and/or is likely to have, among other things, the following anticompetitive effects:

a.    Actual and potential competition in the General Purpose Card Network Services market was substantially excluded, suppressed, and effectively foreclosed;

b.    Visa acquired and maintained market power in the relevant markets of General Purpose Card and General Purpose Card Network Services;

c.    Defendants controlled, maintained, and elevated above competitive levels the Credit-Card Interchange Fees imposed on Plaintiff in the market for General Purpose Card Network Services;

d.    Plaintiff was required to pay supracompetitive Interchange Fees;

e.    Defendants derived direct and substantial economic benefits from the supracompetitive Credit-Card Interchange Fees in the market for General Purpose Card Network Services;

f.    But for the anticompetitive conduct of Visa and its Member Banks, competition among banks would have eliminated or greatly reduced the Credit-Card Interchange Fees in order to gain business from Merchants; and

g.    But for the anticompetitive conduct of Defendants, Plaintiff would have  saved millions of dollars by avoiding payment of collectively fixed Interchange Fees.

188.    The collectively fixed Interchange Fee is illegal. It is not necessary to accomplish any procompetitive benefit of the Visa network. Even if some horizontal agreement were

2730457v1/101971

necessary to promote the efficiencies of the Visa network, the collectively-set Interchange Fee is significantly more restrictive than necessary to bring about those efficiencies. Visa and its Member Banks' price fixing achieved few procompetitive benefits to counterbalance its demonstrated anticompetitive effects in the General Purpose Card Network Services market.

189.    As a consequence of Visa's and its Member Banks' illegal combinations and conspiracies in violation of the Cartwright Act, Plaintiff suffered injury to its

business and property, in part, because it was charged higher Credit Card Interchange Fees by Issuing Banks in the market for General Purpose Card Network Services than they would have paid in the absence of the Defendants' conduct. The specific amount of damages suffered by Plaintiff has not yet been determined, as such determination will require additional discovery and expert analysis. The supra-competitive levels of Interchange fees continue to the present date.

### Count 7: Violation of Cartwright Act
### by Visa, Chase and Member Banks Regarding Debit Cards

190.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

191.    Throughout the relevant period, Visa and its Member Banks, including the Chase Defendants — direct, horizontal competitors of each other — engaged in unlawful contracts, combinations, and conspiracies in an unreasonable restraint of interstate trade or commerce in violation of § 16700 *et seq.* of the Cartwright Act (Bus. & Prof. Code, § 16700 *et seq.*). A substantial part of the acts constituting these unlawful contracts, combinations, and conspiracies took place within the State of California.

192.    The unlawful contracts, combinations, and conspiracies consisted of continuing agreements, understandings, and concerts of action between and among Visa's issuing and acquiring members, including the Chase Defendants, and Visa, the substantial terms of which

were to illegally fix, raise, maintain, or stabilize the Debit Card Interchange Fees imposed on Merchants in the market for Debit Card Network Services.

193.    The Visa Board of Directors, which includes representatives from Chase, voted to fix, raise, maintain, or stabilize the Debit Card Interchange Fees for Visa transactions, in violation of § 16700 *et seq.* of the Cartwright Act.

194.    All of the Member Banks of Visa, including the Chase Defendants, have had actual knowledge of, and have knowingly participated in, the conspiracy alleged herein.

195.    The contract, combination, conspiracy, and agreement has had, and/or is likely to have, among other things, the following anticompetitive effects:

a.    Actual and potential competition in the Debit Card Network Services market was substantially excluded, suppressed, and effectively foreclosed;

b.    Visa acquired and maintained market power in the relevant markets of Debit Cards and Debit Card Network Services;

c.    Visa controlled, maintained, and elevated above competitive levels the Debit Card Interchange Fees imposed on Plaintiff in the market for Debit Card Network Services;

d.    Plaintiff was required to pay supracompetitive Interchange Fees;

e.    Defendants derived direct and substantial economic benefits from the supracompetitive Debit Card Interchange Fees in the market for Debit Card Network Services;

f.    But for the anticompetitive conduct of Visa and its Member Banks, competition among banks would have eliminated or greatly reduced the Debit Card Interchange Fees in order to gain business from Merchants; and

g.    But for the anticompetitive conduct of Defendants, Plaintiff would have saved millions of dollars by avoiding the imposition of collectively fixed Interchange Fees.

196.    The collectively fixed Interchange Fee is illegal. It is not necessary to accomplish any procompetitive benefit of the Visa network. Even if some horizontal agreement were

necessary to promote the efficiencies of the Visa network, the collectively-set Interchange Fee is significantly more restrictive than necessary to bring about those efficiencies. Visa and its Member Banks' price fixing achieved few procompetitive benefits to counterbalance its demonstrated anticompetitive effects in the Debit Card Network Services market.

197.    As a consequence of the Defendants' illegal combinations and conspiracies, Plaintiff suffered injury to its business and property, in part, because higher Debit Card Interchange Fees were imposed on it in the market for Debit Card Network Services than would have been in the absence of the Defendants' conduct. The specific amount of damages suffered by Plaintiff has not yet been determined, as such determination will require additional discovery and expert analysis. The supra-competitive levels of Interchange continue to the present date.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A.    Judgment in favor of Plaintiff and against each Defendant, in an amount to be determined at trial including, but not limited to, compensatory damages, trebled damages, and pre-judgment and post-judgment interest, as permitted by law;

B.    An award of the cost of the suit, including a reasonable attorney's fee;

C.    Order that Defendants, their directors, officers, employees, agents, successors, and members be enjoyed and retrained from, in any manner, directly or indirectly, committing any violations of the Cartwright and Sherman Acts or other violations of statutes having a similar purpose or effect; and

D.    Such other and further relief as the Court deems just, equitable, and proper.

## **JURY DEMAND**

Plaintiff hereby demands trial by jury of all issues properly triable thereby.

2730457v1/101971

DATED:  May 28, 2013

Respectfully submitted,

By: _____

Arun Subramanian
NY Bar No: 4611869
SUSMAN GODFREY LLP
560 Lexington Ave., 15th Floor
New York, New York 10022
(212) 336-8330
asubramanian@susmangodfrey.com

William R. H. Merrill
SUSMAN GODFREY LLP
1000 Louisiana St.
Suite 5100
Houston, Texas 77002
(713) 651-9366
bmerrill@susmangodfrey.com

Jeffery Frank Nadalo
General Counsel for Buc-ee's, Ltd.
327 FM 2004
Lake Jackson, Texas 77566
(979) 230-2950
jeff@buc-ees.com